**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **CARYTOWN JEWELERS, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ST. PAUL TRAVELERS COMPANIES,** ) | |
| **INC.** ) | **CIVIL NO. 3:06CV312** |
| ) | |
| **and** ) | |
| ) | |
| **TRAVELERS CASUALTY & SURETY** ) | |
| **COMPANY OF AMERICA,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

This matter is before the Court on the Defendants, St. Paul Travelers Companies, Inc.'s and Travelers Casualty and Surety Company of America's (collectively the "Defendants" or "Travelers") Motion for Summary Judgment (docket entry no. 16).  Upon review of all relevant submissions and oral argument, this Court entered an Order on January 10, 2007, granting the Defendants' Motion.  This Memorandum Opinion is intended to provide the reasoning therefor.

## Facts and Material Inferences

The Defendants issued Plaintiff Carytown Jewelers ("Carytown") a Commercial Crime Insurance Policy (the "Policy" or the "Crime Policy") for the period July 25, 2003, through July 25, 2004.  (Compl. ¶ 6 & Ex. 1; Answer ¶ 6.)  Among other features, the Policy obligated the

Defendants to cover losses incurred by Carytown if such losses were caused by acts of "employee dishonesty." (Compl., Ex. 1.)  Carytown alleges that on September 18, 2003 (a date within the Policy period), its store suffered a loss of over $370,000 in jewelry and other inventory as a result of a burglary committed by one of its employees during a severe weather occurrence (Hurricane Isabel).  (Compl. ¶ 8.)  Carytown believes that its loss was caused by Joel Harris ("Harris"), a person Carytown asserts to have been an employee of Carytown at the time of the break-in. (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. ("Pl.'s Mem.") at 4-13.)  Since the Crime Policy provides "employee dishonesty" coverage, and since Harris is alleged to have been an employee who committed the burglary at his place of employment, Carytown asserts that its loss must be covered by the subject Policy.[1]  The Richmond, Virginia Police Department conducted an investigation into the alleged burglary at Carytown, including interviews with various witnesses, but no charges were ever filed against anyone for the burglary, including Harris.  (Br. Supp. Defs.' Mot. Summ. J. ("Defs.' Br.") at 7-8.)

Pursuant to the Policy's "employee dishonesty" provision, Carytown asserts that the Defendants' refusal to provide coverage for the loss constitutes a breach of the Policy.  (Compl. ¶ 20.)  Carytown seeks compensatory damages for the alleged breach, prejudgment and post-judgment interest, costs, and attorney's fees.  See id., *Ad Damnum Clause*.

The Commercial Crime section of the Policy provides the following coverage for acts of

---

[1] Carytown initially sued its security company, ADT Security Services, Inc. ("ADT"), on January 7, 2005, alleging a failure by ADT to notify the local police of the burglary within a reasonable time.  See Carytown Jewelers, Inc. v. ADT Sec. Servs., Inc., Civil Action No. 3:05cv84 (E.D. Va. 2005).  Carytown thereafter terminated the litigation and notified the Defendant insurers of the alleged employee dishonesty claim by submitting a Proof of Loss to the Defendants on July 15, 2005.  (Compl. ¶ 10.)

employee dishonesty:

### A.    COVERAGE

We will pay for loss of, and loss from damage to, Covered Property [*i.e.*, "money," "securities," and "property other than money and securities"] resulting directly from ["employee dishonesty"].

...

### D.    ADDITIONAL EXCLUSIONS, CONDITION AND DEFINITIONS:

...

### 3.    Additional Definitions

**a.    "Employee Dishonesty"** in paragraph A.[] means only dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons, except [Carytown] or a partner, with the manifest intent to:

**(1)**    Cause [Carytown] to sustain loss; and also

**(2)**    Obtain financial benefit (other than employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions) for:

**(a)**    The "employee";

....

(Policy No. 104118977 (hereinafter the "Crime Policy") at 00638.)[2]  The Crime Policy defines an "employee" as:

_____

[2] The number "00638" refers to the Bates number placed on the Policy noted as Defendants' Ex. 1 supporting their motion for summary judgment.  All subsequent citations to the Policy will be made in the same format.

        **a.**     Any natural person:

               **(1)**    While in [Carytown's] service (and for 30 days after termination of service); and

               **(2)**    Whom [Carytown] compensate[s] directly by salary, wages or commissions; and

               **(3)**    Whom [Carytown has] the right to direct and control while performing services for [Carytown];

        **b.**     ...

        But "employee" does not mean any:

               **(1)**    Agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character;
            ....

(The Crime Policy at 00637.)

Therefore, for the alleged burglarious acts to fall within the ambit of the Policy's coverage, Carytown must prove that on the date of the burglary, September 18, 2003: (1) Harris was an employee (a) who was in Carytown's service, (b) who was compensated by Carytown in the form of salary, wages, or commissions, (c) who was directed and controlled by Carytown while performing services for Carytown, and (d) who was *not* an agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; *and* (2) that as an employee, Harris committed "dishonest acts," *i.e.*, the burglary, with the intent to cause Carytown to sustain loss and obtain financial benefit for himself; *and* (3) that Harris' dishonest acts resulted in financial or property loss to Carytown.  It is undisputed that the burglary resulted in financial or property loss to Carytown, so the final element necessary to establish Policy coverage is not at issue.  The issues before the Court are therefore whether a

genuine issue of material fact exists with respect to: (1) whether Harris was Carytown's "employee"; and (2) if so, whether Harris committed the alleged burglary.  The Defendants contend the evidence in the record establishes, as a matter of law, that no genuine issue of fact exists with respect to either issue.  (Defs.' Br. at 2.)

## Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering whether to grant a motion for summary judgment, the court must assess the evidence offered by both parties and "determine whether there is a genuine issue for trial" after viewing the evidence in the light most favorable to the non-moving party and resolving all factual disputes in that party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

To defeat a summary judgment motion, the non-moving party may not rest upon mere allegations or denials, but must "set forth specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  In essence, the Court must decide if the evidence when viewed in the light most favorable to the non-moving party "presents a sufficient disagreement to require submission to the [factfinder] or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

## Analysis

The parties agree that the Crime Policy language is clear and unambiguous.  (Pl.'s Mem. at 2; Defs. Reply to Pl.'s Mem. Opp'n Mot. Summ J. ("Defs.' Reply") at 2.)  Controlling

Virginia law is clear and well-settled on the governing standard for interpreting contracts, including insurance policies: Virginia strictly adheres to the "plain meaning" rule, meaning that "where an agreement is complete on its face and is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself...because the writing is the repository of final agreement between the parties." See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 405 (4th Cir. 1998) (quoting Lerner v. Gudelsky Co., 334 S.E.2d 579, 584 (Va. 1985)). As such, "[w]ords that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the [insurance policy] will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." D.C. McClain, Inc. v. Arlington County, 452 S.E.2d 659, 662 (Va. 1995) (citations omitted). Thus, the analysis properly begins with the language of the policy and must end where, as here, the pertinent policy language has a clear and unambiguous plain meaning. Gulf Underwriters Ins. Co. v. KSI Servs., Inc., 416 F. Supp. 2d 417, 420 (E.D. Va. 2006).

**1. Was Harris an "Employee" of Carytown?**

*A. Was Harris in Carytown's Service and Subject to Carytown's Direction and Control?*

A sufficient dispute of material fact exists as to whether Harris was in Carytown's service at the time of the burglary. This is so because of such undisputed evidence as the fact that, on the day of the break-in, Harris opened the store that morning, worked in the store all day, and closed the store that afternoon. (Pl.'s Mem. at 4; Abdeen Aff. ¶¶ 21, 27.) Although Harris stated that he performed these functions as a "courtesy" to Abdeen, (Harris Aff. ¶ 11), such facts are nonetheless sufficient to create a genuine issue as to whether Harris was in Carytown's "service" on the day of the burglary because Harris was performing a useful function for Carytown by

assisting it in the performance of its daily functions, procedures, and purposes.  See Black's Law Dictionary 1399 (8th ed. 2004) (defining "service" as, *inter alia*, "[t]he act of doing something useful for a person or company for a fee.").

Likewise, a dispute of material fact exists as to whether Carytown had the right to direct and control Harris while he performed services for Carytown.  On the one hand, Travelers has submitted evidence showing that Carytown did not control the time, manner, or method of Harris' work.  Indeed, Carytown's owner, Mr. Hasan Abdeen, testified that he did not control the hours his employees worked because many worked off of commissions.  See Defs.' Br. at 16. Moreover, in 2003, Harris and Abeen formed a business relationship between their respective companies, Harris' White Star Jewelry, and Abdeen's Carytown Jewelers.  Under this relationship, Harris/White Star would sell items that were provided to it by Abdeen/Carytown via the internet on a consignment/vendor basis.  Id. at 3, ¶ 8.  Harris formed White Star for the purpose of selling jewelry on the internet and, accordingly, he hired and paid his own employees separate and apart from those paid by Abdeen to Carytown's employees.  Id. at 3-4, ¶ 9.  Under the business relationship Harris formed with Carytown, both Harris and Abdeen shared their respective profits in the forms of commissions made on each person's individual jewelry sales. Id. at 17.  As Travelers notes, Abdeen testified by deposition that Carytown was doing nothing more than supplying Harris the goods (*i.e.*, the jewelry) and the place to sell those goods.  Id.

On the other hand, Carytown has submitted evidence tending to show that Harris was under Carytown's direction and control while in the service of Carytown.  Indeed, Carytown asserts that Harris followed Abdeen's "system" for sales at Carytown, and that Abdeen set the sales prices and dictated the who, what, when, where, and how of the sales.  (Pl.'s Mem. at 6;

Abdeen Aff. ¶ 22.)  Moreover, there is evidence in the record that Harris never sold a single piece

of jewelry without obtaining Abdeen's "blessing."  (Pl.'s Mem. at 6.)  The dispute in the

evidence therefore raises a genuine issue of material fact as to whether Harris was, in fact, under

Carytown's direction and control while performing services for Carytown.

   B.  Did Carytown Compensate Harris Directly by Salary, Wages, or Commissions?

   The Defendants assert that no genuine issue of material fact exists that Harris was not an

employee of Carytown because he was not directly compensated by Carytown in the form of

salary, wages, or commissions as required by the definition of "employee" in the Crime Policy.

Carytown's accountant from 1993 through February 2004, Mr. Richard Worcester, was in charge

of all aspects related  to the payroll and other employee compensation matters.  (Worcester Aff.

¶¶ 5-6; Defs. Br. at 5.)  He has stated, under oath, that: (1) he never calculated wages, tips, or

other compensation for Harris on behalf of Carytown; (2) he never calculated or withheld federal

or state income tax, FICA tax (Social Security and Medicare withholdings), or unemployment

taxes for Harris on behalf of Carytown; (3) he never completed a W-2 wage reporting for Harris;

and (4) he never filed, with regard to Harris, the required IRS Form 941 (an employer's quarterly

federal tax return) which is used to confirm the number of employees who received wages, tips,

or other compensation for the annual pay period.  (Worcester Aff. ¶¶ 7-10.)  Furthermore, even

though all employers are required to maintain an IRS W-4 form (evidence of social security

number, information regarding marital status, and number of exemptions) on file for each of its

employees, Carytown had no such W-4 form on file for Harris at any time.  Id. ¶ 12.  Such

circumstances support the inference that Harris was not considered an "employee" of Carytown.

Indeed, Worcester concluded that, "[f]or tax and accounting purposes, Joel W. Harris was never

an employee of Carytown Jewelers; I never had knowledge that Joel W. Harris was an employee of Carytown Jewelers."  Id. ¶¶ 14-15.

Carytown earnestly asserts that its lack of employment forms on file regarding Harris is irrelevant because "this is not a breach of contract action; [nor] an IRS audit."  (Pl.'s Mem. at 5.) To the contrary, the documents are indeed relevant to resolution of the issue before the Court where it is not using the omitted forms to show that either party has breached a contract; nor is the Court considering such evidence to suggest that Carytown violated Federal tax law.  Instead, the forms are useful for determining the total number of persons a corporation considers to be its employees, and how much money is being paid to those particular employees.  As such, at the very least, the forms are helpful in identifying particular individuals employed by a specific employer, and the fact that Harris is not identified is further evidence of his non-employee status.

Presumably, Carytown would not make the same "irrelevancy" argument if Harris were listed on Carytown's W-2 or W-4 forms, or if documentation otherwise existed demonstrating that social security or medicare tax was being withheld for Harris' benefit.  Undoubtedly, Carytown would use such documentation to help establish Harris' status as an employee of Carytown.  The Defendants use the omission of such evidence for the opposite and valid conclusion – that Harris was *not* an "employee" of Carytown because he was not receiving a salary or wages – and the omissions are, therefore, relevant to resolution of the issue because they tend to prove that Harris was not directly compensated by Carytown, and thus not an "employee" as that term is defined in the Crime Policy.  See Fed. R. Evid. 401 ("'Relevant evidence' means evidence having the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

without the evidence.").  The Court also deems it worthy of note that the lack of documentation or record keeping as to Harris' "employee" status is unusual for a business that otherwise made it a "customary" practice to "provide the net pay of an employee [to Mr. Worcester to] calculate a gross pay salary amount and associated withholding for that employee," but which never provided such information for Harris.  (Worcester Aff. ¶ 11.)  The lack of such a record regarding Harris, contrary to Carytown's standard business practice, further supports the conclusion that Harris was not an employee of Carytown.

Carytown also argues that it directly paid Harris a "salary" or "wages" in the form of housing, in that Carytown provided an apartment for Harris above Carytown's place of business. (Pl.'s Br. at 5.)  But the mere fact of providing housing does not necessarily allow for the inference that Carytown provided it as compensation for Harris.  Indeed, there is no evidence in the record that the apartment was a form of payment to Harris as an employee of Carytown. Abdeen merely affirmed that Harris "lived in an apartment above Carytown's place of business," and that "Harris did not pay rent."  (Abdeen Aff. ¶ 24.)  In fact, the housing could have simply been a goodwill gesture from Abdeen to Harris due to their twenty-year friendship and participation in joint business ventures.  Thus, the provision for housing cannot be conclusively considered as a form of "salary, wage, or commissions" paid by Carytown to Harris as an employee.

The only evidence tending to support the fact of Harris' payment in the form of "salary, wages, or commissions" is a single check issued by Carytown to Harris in the amount of $301.80.  (Defs.' Br., Ex. 6.)  The memo line of the check, which is dated July 8, 2003, states that payment was for "commission on sales."  Id.  Carytown argues that the check, explicitly

labeled as a commission payment, conclusively demonstrates that Harris was an "employee" of Carytown as that term is partially defined in the Crime Policy.  (Pl.'s Mem. at 4-5.)

In this regard, of particular relevance is the Crime Policy's provision which expressly excepts "commission merchants" and "consignees" from being "employees" under the Policy. (The Crime Policy at 00637.)  From time to time, Carytown sold merchandise to Harris' White Star jewelry enterprise, and then White Star would sell the items on the internet on a consignment/vendor basis.  (Defs.' Br. at 3, 20.)  Indeed, Harris sold Carytown's items on a shared-profit basis with Carytown.  Id. at 20.  Harris testified that this consignment arrangement between White Star and Carytown began in the Spring of 2003 (Harris Aff. ¶¶ 2-4), an arrangement that was effective well before the burglary occurred the following Fall, and at a time before the Policy became effective in July of that same year.  Thus, there is no reason to believe that Harris was not acting as a consignee, factor, or commission merchant in his dealings with Carytown at the time of the loss.

Because these terms are not expressly defined in the Crime Policy, they must be given their usual, common, and ordinary meaning.  See D.C. McClain, 452 S.E.2d at 662.  A consignee is "[o]ne to whom goods are consigned," Black's Law Dictionary 327 (8th ed. 2004), and to "consign" means "[t]o give (merchandise or the like) to another to sell, usually with the understanding that the seller will pay the owner for the goods from the proceeds," id.  Moreover, a "commission merchant" is a term synonymous with a "factor," the latter term being defined as an "agent who is employed to sell property for the principal and who possesses or controls the property; a person who receives and sells goods for a commission[, e.g.,] a factor was employed to sell goods for the company[]."  Id. at 630; see also Slack v. Tucker, 90 U.S. 321, 330 (1875)

(noting that the difference between a "commission merchant" or "factor" and a "broker" is that "a factor may buy and sell in his own name, and he has the goods in his possession; while a broker, as such, cannot ordinarily buy or sell in his own name, and has no possession of the goods sold."). Carytown sold jewelry to Harris' White Star company at wholesale, and White Star would then sell the jewelry on the internet.  Harris' website was understood by Carytown to be owned and/or controlled by Harris.  (Defs.' Br. at 18.)  Harris and Abdeen would then share the profits, with Harris receiving his share in the form of a commission.  These commissions were derived from Harris' own sales, and Abdeen testified that Harris never received a percentage of Carytown's profits.  (Defs.' Br. at 17 (citing the deposition testimony of Abdeen)). Harris could not have performed such acts without first obtaining possession of the goods to be sold.  Pursuant to the definitions noted, Harris was either a  "consignee," "commission merchant," "factor," or "representative of the same general character" as those terms are commonly understood, and therefore not an employee of Carytown.

Furthermore, there is no evidence tending to refute the logical inference that the consignment relationship did not exist at the time of the burglary.  Abdeen's testimony only bolsters the conclusion.  He testified in the ADT suit that Harris was a mere "business friend," and that Harris was "not basically an employee" of Carytown because Carytown merely made their "goods available to him."  (Defs.' Br., Ex. 3 (Abdeen Dep. 115:9-115:17; 116:20-117:7, Apr. 25, 2005.))  And, even though Abdeen later testified in his deposition in this case, *after* he made demand for coverage that was denied, that the consignment arrangement became effective sometime *after* the burglary occurred at Carytown (Defs.' Ex. 2 (Abdeen Dep. 159:7-159:22, Nov. 15, 2006)), he contradicted the same assertion in the same deposition when he testified that

-12-

he had no specific recollection as to when Harris began to purchase inventory from him.  (Id. 257:1-257:8).  A party may not create a genuine issue of material fact by presenting two conflicting versions of events.  Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").  This Court, therefore, gives no weight to Abdeen's testimony regarding the time when the consignment relationship with Harris began because his testimony is internally inconsistent and otherwise insufficient to create a genuine issue of disputed material fact that would preclude dispositive relief.[3]

Harris unequivocally attested that the consignment arrangement began in the Spring of 2003, a time well before the burglary occurred in September of that same year.  (Harris Aff. ¶¶ 2-4, 6-7.)  His position is corroborated by a May 17, 2003 letter from Harris/Whitestar to Abdeen/Carytown summarizing the consignment proposal terms (Defs. Reply, Ex. 4.), as well as Abdeen's express acknowledgment that a consignment relationship did, in fact, exist between he and Harris at some point.  Moreover, Harris attests that he was never an employee of Carytown, and that he was never compensated for any service on behalf of Carytown.  (Harris Aff. ¶¶ 8-9.)  Rather, his understanding of the single check was that it was a commission under the

---

[3] Carytown also submitted its corporate tax return for the period covering November 2002 through October 2003.  (Pl.'s Mem., Ex. B.)  Carytown argues that the return discloses the commission paid directly to Harris and "shows an expense deduction" claimed as a result of this payment.  (Pl.'s Mem. at 6.)  The return is unauthenticated, incomplete, and lacking the appropriate foundation.  Moreover, the Defendants requested the subject return during discovery, but Carytown failed to produce the document even though it manifested a willingness and intent to do so.  (Defs.' Reply, Exs. 6 (¶ 16) & 7.)  Even if the Court were to consider such evidence, it is of no significance because the "commission" deduction is not listed as a salary or wage deduction, thus further supporting the conclusion that Harris was not an employee of Carytown.

consignment sales arrangement he had with Carytown.  Id. ¶ 10.  Even Worcester, after

reviewing the check, affirmed that it "does not have anything to do with employment at

Carytown."  (Worcester Aff. ¶ 13.)  This Court can only conclude that the single commission

check was, in fact, a consignment sales check paid to Harris under the business arrangement

between White Star and Carytown, a payment which made Harris a "consignee," "commission

merchant," or "representative of the same general character," rather than an "employee" of

Carytown.

Accordingly, where the evidence clearly supports the conclusion that Harris was not an

employee of Carytown at the time of the loss, coverage is precluded and it is not necessary to

address the second issue of whether Harris committed the burglary.[4]

### Conclusion

For the foregoing reasons, the Defendant insurers' Motion for Summary Judgment must

be GRANTED.

_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge


Date: 1/18/07

---

[4] This Court also notes that a person is an "employee" under the Policy if he or she is
compensated directly in the form of "salary, wages, or commission*s*."  (The Crime Policy at
00637) (emphasis added).  The term "commissions" is used in the plural, not the singular, thus
indicating the requirement for a pattern of regular compensation such that a single commission
payment is insufficient to qualify a person as an "employee" under the Policy.  Therefore, even
assuming that the single check issued to Harris was a commission payment, it would still not
satisfy the definition of an "employee" in the Policy.